[Civ. No. 15340. Second Dist., Div. Two. Dec. 13, 1946.]

PAUL L. SCHWARTZ, Respondent, v. WILLIAM C. TEUNISZ et al., Appellants.

Adams & Duque and A. Andrew Hauk for Appellants.

James D. Randles for Respondent.

McCOMB, J.—From a judgment in favor of plaintiff, after trial before the court without a jury, in an action to recover commissions allegedly due under the terms of a sales manager's contract for the sale of franchises covering new type milk bottle patents owned by defendants and known as the "Modern Top Milk Bottle Combination," defendants appeal.

The material portion of the contract between plaintiff and defendants is as follows:

Date: May 25, 1939

Position: Sales Manager

Commissions: A. Personal Franchise Commission of 25 per cent upon the gross proceeds received by the company upon franchises sold by plaintiff personally.

B. Overriding Franchise Commission of 5 per cent upon the gross proceeds received by the company upon franchises sold by others than plaintiff.

C. Bottle Commission of 50 per cent upon the gross proceeds received by the company upon the sale of bottles or containers to franchise holders who had been sold franchises by plaintiff personally.

D. Separator Commissions at the prevailing rate upon the sales of separators to customers to whom plaintiff had personally sold franchises.

E. Renewal or Substitution Commissions (so-called Repeat Commissions) upon proceeds received by company upon renewal or substituted franchises sold to customers previously sold franchises as above, whether plaintiff is connected with the company at the time of the renewals or not, provided

plaintiff or a person by him designated performs all services in arranging the renewals prior to the expiration of the old franchises if he is no longer with the company.

Termination: May be effected by either party on written notice, but not to affect commissions except as above provided and not to affect any pending deal which is closed within 60 days after termination.

After the above contract was entered into plaintiff sold two or three franchises during the period from May 25, 1939, to November 3, 1939. On November 3, 1939, defendants mailed plaintiff a letter notifying him that the basic contract was canceled and terminated. Plaintiff admitted receipt of the letter but claimed that it was not delivered until two or three months after its date. Three additional letters were written by defendants to plaintiff in which they reiterated the termination of the contract. These letters were dated February 6, 1940, March 5, 1940 and March 28, 1940. On April 26, 1940, defendant Teunisz wrote plaintiff and told him that under separate cover, he was sending a cashier's check in the amount of $1,241.21 to the Citizens' Bank at Monrovia, California, together with a letter of agreement of the same date for plaintiff to sign. This check was cashed by plaintiff and the agreement signed May 6, 1940. In the answer to plaintiff's suit, in addition to general denials defendants pleaded (1) cancellation and termination of the basic agreement, and (2) a release, accord and satisfaction.

■ Defendants contend, without merit, that there is not any substantial evidence to sustain the trial court's finding upon the following issues:

## Issue No. I

*Was there a valid cancellation and termination of the basic contract on or about November 3, 1939?*

### Findings

The court found:

". . . (1) That it is not true that the said contract of May 25, 1939, was terminated on the 3rd day of November, 1939, but that the engagement of Paul Schwartz was terminated on the 3rd day of November, 1939, and pursuant to the terms of said contract of May 25, 1939, but that said termination of the engagement of Paul Schwartz as Sales Manager for William C. Teunisz, trading under the name of Modern Top Milk Bottle

Company, did not terminate the right of plaintiff to commissions earned pursuant to the terms of said contract, in that said contract of May 25, 1939, was a continuing contract for the payment of commissions due plaintiff pursuant to the terms thereof.''

### Evidence

The basic contract of May 25, 1939, contains this:

''The Company engages Schwartz as its sales manager for the sale of franchises covering articles made pursuant to the foregoing patents and Schwartz agrees to act as such,'' and after providing for commissions he was to receive under said contract, it reads as follows:

''Fifth: On written notice by either party to the other, the engagement of Schwartz will terminate, but

''A. Such termination will not affect commissions on renewals or substitutions, except as hereinabove provided for [such exceptions refer to the default by plaintiff or his estate arranging for renewals or extensions and is not material here], and

''B. Such termination will not affect any deal in the process of negotiation at the time of termination which is closed within sixty (60) days after the termination, provided, however, that Schwartz stands ready and offers his services in trying to consummate the negotiation of the deal and further provided that the deal is actually consummated within sixty (60) days.

''Sixth: This agreement binds the heirs, executors, administrators and assigns of each of the parties.''

On November 3, 1939, defendant wrote a letter to plaintiff which contains the following statement:

''This, of course, will. terminate your contract with us entered into the 25th day of May, 1939. This will not, however, effect [sic] your commissions of said contract other than the 5% overwriting, which we have in the past paid you on all salesmen appointed by you, and which you will continue to receive on any business they have received prior to this termination.''

The foregoing quotation from the basic contract together with the quotation from the purported cancellation of November 3, 1939, sufficiently sustains the finding complained of. However, other evidence showed conclusively that it was the intention of the parties that the basic contract was to continue

and, as a matter of fact, did continue insofar as payments of commissions to plaintiff were concerned.

The deposition of Gustav W. Rhadans contains this:

"Interrogatory 8: (B) Itemize by giving date and amounts paid to Paul Schwartz, plaintiff in this action, from *November 3, 1939* to *February 14, 1944,* on account of the licensee commissions received by Modern Top Milk Bottle Company from the following list of dairies: [Here the witness itemizes the accounts from the various dairies and then sums it up.]

"The total of all the foregoing commissions for this period is $9,074.64." (Italics added.)

"Interrogatory 9: Please itemize all payments made by Modern Top Milk Bottle Company to Paul L. Schwartz, plaintiff in this action (showing date of payment and amount paid for each dairy and glass company account) from November 3, 1939 to February 14, 1944.

"Answer: In answer to Interrogatory No. 9, I will say that the foregoing answer covers all moneys paid to Paul Schwartz on all classes of commissions between November 3, 1939 to February 14, 1944. It is a complete statement of what we have done with him and what we have paid him."

Also from the testimony of Gustav W. Rhadans in the deposition:

"Q. In your former testimony you stated that all bottle commissions paid to Schwartz for this period and all other commissions of all kinds total $9074.64. A. Yes.

"Q. From what period to what period is here covered? A. From November 3rd, 1939, to February 26th, 1943.

"Q. In your former testimony you stated, under the head of 'Expense Items' (which appears to be at the top of page 10 of this deposition), several items. Whether or not these were charges made against Paul Schwartz, and deducted from his commissions? A. Yes.

"Q. Did the company, the defendant in this case, communicate to Schwartz anything in relation to that? A. Yes.

"Q. What was that? A. That was a monthly sales statement on which the amounts due him were stipulated and the checks paid him and the expense items charged to him.

"Q. Did he ever make any complaint in this connection? A. Not to my knowledge.

"Q. With reference to that same paragraph your last item is 'Social Security deduction, $1.63.' Will you kindly explain that? A. He received the check in the amount of $160.87.

$1.63 was deducted from the amount of $162.50, leaving that as a balance, $160.87.

"Q. What were all the other items in that paragraph? A. Those are charges against him.

"Q. Did you charge off social security or charges of that kind? A. Yes."

Thus, as we review the basic contract we find by the very wording of it that it was contemplated by the parties that it should be a continuing contract extending even beyond the grave, for it provided for conditions covering the estates of the parties and even as to the legal obligations of the "heirs, executors, administrators and assigns of each of the parties." However, as to the relationship of plaintiff as sales manager for defendant, that was quite another matter and it was specifically provided in said contract how said relationship might be terminated and what the effect of said termination would be.

The contract expressly defines what is meant by the word termination. Again we quote from the basic contract:

"Fifth: On written notice by either party to the other, the engagement of Schwartz will terminate, but

"A. Such termination will not affect commissions on renewals or substitutions, except as hereinabove provided for, and

"B. Such termination will not affect any deal in the process of negotiation at the time of termination."

If the basic contract was not sufficiently clear on this point, it was certainly clarified by defendant's letter of November 31, 1939, in which defendant again emphasizes what was meant in the basic contract by the word "terminate." We quote from this letter:

"This, of course, will *terminate* your contract with us entered into the 25th day of May, 1939. *This will not, however, effect* [sic] *your commissions of said contract* other than the 5% overwriting." (Italics added.)

This contract was not an executory contract insofar as the franchises already sold were concerned, nor was there a mutual consent by the parties to its termination.

Even though a contract provides for a termination by express agreement, when it is performed in part such "termination" does not affect the rights that have already accrued under the contract.

This is stated in *Winter* v. *Kitto,* 100 Cal.App. 302, 310 [279 P. 1024], thus:

"The grounds for the claim in the present case that the vendor rescinded the contract were the statements in the notice of default that she elected 'to cancel the contract pursuant to the terms thereof,' and the same 'is hereby canceled and is absolutely void and of no effect,' and the statement by her attorney in his letter to the vendee that the contract by reason of the latter's default had been canceled and was no longer existing. It has been held that a provision in a contract to the effect that a violation of any of its terms or conditions by either party should work a forfeiture and the contract should thereupon become void and of no effect means only that the rights of the party violating it cease, and as to him and to that extent the agreement becomes void and of no effect. The contract, however, remains in effect so as to protect the rights of the innocent party and to enforce the obligations of the delinquent. (*Central Oil Co.* v. *Southern Refining Co.*, 154 Cal. 165 [97 P. 177].)" See, also, *Martinelli* v. *Hogrefe*, 123 Cal. App. 438, 440 [11 P.2d 412].

That the basic contract continued in effect is definitely proved by the payment of commissions and monthly statements sent to Schwartz by the defendant.

In the receipt of April 26, 1940, after acknowledging receipt of $1,241.21 for all sums then due him, the plaintiff states:

"I further agree and declare that I will be entitled to further sums of money in the nature of commissions earned by *virtue* of paragraphs 4 and 5 of said agreement (May 25, 1939) . . ." (Italics added.)

This language is plain and unambiguous. Schwartz was to be entitled to commissions by virtue of the basic contract. This instrument was not intended to replace the basic contract, but rather the language plainly emphasizes the fact that the basic contract was to continue in effect so that Schwartz would receive his commissions.

This language cannot be construed as incorporating paragraphs four and five of the basic contract and making them a part of this agreement. The words "by virtue of" can only be interpreted to mean that Schwartz was to be entitled to commissions by right of the basic contract. There is no other reference to commissions to be earned in this instrument.

The agreement of July 30, 1940, expressly provides that it shall not affect business written by Schwartz in accordance with the agreement dated April 26, 1940. Also the franchise

right in this contract was 30 per cent and no payments were made on that commission percentage.

The agreement of August 14, 1941, provides:

"It is mutually agreed that business written by you under a *prior agreement*, if any, should be honored in accordance with the terms of *said agreement* by you and the Company. However, you shall write all agreements after the date of this contract in accordance with the terms stated herein." (Italics added.)

That this contract is not material here is brought out in the examination of Mr. Schwartz in which the following testimony occurs:

"Q. And the Ragland Dairy of Bakersfield, California, Mr. Schwartz, have you computed the money paid by them in this case? A. No, I was not interested in that billing because that account was sold under Contract No. 3 and should not have been in this Bill of Particulars."

### Issue No. II

 *Was there a valid release and an accord and satisfaction effected which extinguished the basic contract and obligations thereunder on or about April 26, 1940?*

### Findings

"(2) The court further finds that it is true that on or about April 26, 1940, the plaintiff, in writing, acknowledged receipt of all moneys *due and owing to him* under and by virtue of the terms of said agreement dated May 25, 1939, but the court specifically finds that said acknowledgment and receipt did not contemplate nor was it in the mind of the parties that said receipt should contemplate payments that might accrue and be due to plaintiff subsequent to April 26, 1940.

"(3) The court further finds that it is not true that since the said 26th day of April, 1940, there have been no sums of money due or payable from the defendant, William C. Teunisz, or the Modern Top Milk Bottle Company to this plaintiff under or by virtue of said agreement dated May 25, 1939, but that certain sums were due this plaintiff as set forth in the finding above.

"That, as to defendant's further, second, separate and affirmative defense, the court finds as follows:

"(1) That it is not true that on or about April 26, 1940, the said defendant, William C. Teunisz, paid to the plaintiff

the sum of $1,241.21 in satisfaction of all of plaintiff's claims under the said written agreement dated May 25, 1939, or that the plaintiff agreed to or did accept said sum as full payment or in full satisfaction of all sums due him under and by virtue of the terms of said agreement, but, on the contrary, the court finds that the sum of $1,241.21 paid by defendant to plaintiff on the 26th day of April, 1940, was the amount that was agreed upon by and between the parties as being the sum *then due* plaintiff from defendant on the said 26th day of April, 1940, and the court specifically finds that said payment of $1,241.21 did not contemplate the satisfaction of amounts that might thereafter become due and payable to plaintiff under and by virtue of the terms of said agreement dated May 25, 1939.''

### Evidence

In defendant's Exhibit ''A,'' plaintiff acknowledged receipt of $1,241.21 from defendant, ''for all sums *due* me under and by virtue of the terms of an agreement dated, May 25, 1939.'' (Italics added.)

Included in the same instrument is the following:

''I accept said sum of money for the purposes above stated and I further hereby state and declare that all of my right of hire and employment by virtue of said contract was wholly terminated and ceased as of November 3, 1939.

''I further agree and declare that I will be entitled to further sums of money in the nature of commissions earned by virtue of paragraphs 4 and 5 of said agreement. . . .''

The evidence cited under issue No. 1 above, as to the parties continuing to act under the basic contract as to payments, etc., is also material on this issue.

The following evidence proves that there was a dispute over the *amount* of money that was due and that there was no dispute as to the obligation of the defendant to pay commissions under the contract. The following is testimony by the plaintiff when called by counsel for defendant under Code of Civil Procedure section 2055:

''Q. And you and he were having a dispute as to whether or not you were still entitled to anything under the contract were you not? A. No, there wasn't any dispute about that. . . .

''Q. By Mr. Duque: Now, as I understand your answer to the previous question, Mr. Schwartz, you say that you were not having a dispute with Mr. Teunisz between the date of

November 3, 1939, and April 26, 1940, is that correct? A. Not on the terms of the contract. Only on the payment of the commissions due me, that was the dispute, yes, sir.

"Q. Was there any dispute between you as to whether the contract was canceled or whether it was not canceled? A. No, the paper that I had signed on April 26, 1940, which he claims nullified the contract of May 25, and all that preceded, that was never accepted by me personally as a release to him, he knew that I was desperately in need of moneys for four months which I had earned and collected for him, and sent to him, and which he refused to pay me those commissions on. I wired him several times——

"Q. Now, just a minute——. A. Just a minute, this is very important. I wire him several times and told him that I would bring suit unless he paid me in full immediately, and that check that he sent in for $1,241.21, was in response to my suit for past due accounts, that was no settlement or no nullification of any contract whatever. . . .

"A. There was no dispute between the Modern Top and myself regarding the cancellation of a contract as written May 25, 1939. The dispute between Mr. Teunisz and myself was regarding the past due delinquent payments."

It is agreed that there was a dispute between plaintiff and defendant at the time the instrument of April 26, 1940, was signed by plaintiff. This dispute is evidenced by letters, as well as oral testimony, and is shown to be over the amount of money that was then due Schwartz for commissions earned by him.

Defendant wrote a letter to Schwartz on January 23, 1940, during this period of dispute which contains the following statement:

"This is to inform you that as per your recent wire, asking for money, that your account is still in the 'red.' However, if you are in need of money, it is our suggestion that you take steps immediately to make collection on the following accounts, on which you are entitled commission under your old working agreement. . . .

"Upon receipt of these checks your account will be out of the 'red' and as soon as this is accomplished, we will mail you a check for whatever is coming to you."

Also the letter of February 6, 1940, to Schwartz from defendant's sales manager states:

"This is the only credit that you are legitimately entitled

to under this section of your contract which was declared null and void November 3, and which no further credits on new business will be given after January 3, 1940.

"After payments come in and renewal of franchises are accepted, your account will be credited accordingly."

These letters make it plain that there was no intent on the part of either of the parties to question the obligation of the Company to pay commissions on franchises already sold by Schwartz.

There was a dispute as to certain expense items that were deducted from his account and also as to what amounts had been paid to defendant by various dairies. There is nothing in the letters, however, that would indicate an attitude of "There is no more liability on the part of the Modern Top Bottle Company for payment of commissions for franchises already sold under the contract."

Without such an attitude being shown there can be no interpretation of the receipt of April 26, 1940, that would give this instrument the effect of canceling all future liability under the contract of May 25, 1939.

Defendants have cited *Mathews* v. *Pacific Mutual Life Insurance Co.*, 47 Cal.App.2d 424 [118 P.2d 10], as supporting the contention that an accord and satisfaction was created although future payments were involved. The principle of the Mathews case is sound, but not applicable here. As to the point at issue the court states at page 428 et seq.:

"Payments were not required in the event of his recovery, however, and at the time the settlement was made in 1932, no one could tell when that event would occur. As a matter of fact, *defendant then contended that such event had already occurred,* and at the time of such settlement there was a serious dispute as to whether any more payments were due under the policy." (Italics added.)

Liability of the defendants for commissions earned by Schwartz was never in dispute. The dispute was over the amounts that were received by the defendant for franchise sales, certain deductions and allowances for expenses, and similar accounting problems, but did not concern the basic liability of the defendant to pay commissions for services rendered by Schwartz.

## Issue No. III

■ *Assuming that the basic contract had been extinguished by cancellation and termination by release or by ac-*

*cord and satisfaction, did plaintiff perform according to the
terms of the contract so as to be entitled to any commissions?*

### Findings

The court found:

"(2) That at the time of making said contract of May 25,
1939, the defendant, William C. Teunisz and the plaintiff,
Paul Schwartz, had in mind and contemplated the matter of
fixing the commissions due plaintiff on account of certain
franchises which had been sold by plaintiff for defendant to
certain firms and dairies or were then in the process of selling
or would thereafter be sold under the terms of said agreement
by this plaintiff.

"(3) That within three years prior to the commencement
of this action and pursuant to said contract of May 25, 1939,
and sale of franchises by this plaintiff and for the said William
C. Teunisz, the plaintiff earned and became entitled to receive
certain commissions from the defendant, William C. Teunisz,
because of certain sums paid to defendant, W. C. Teunisz on
account of said sales.

"(4) Pursuant to said contract of May 25, 1939, there is
due the plaintiff by reason of commissions earned under Sub-
division A of the fourth paragraph of said contract to wit:
'25 percent of the gross proceeds from all franchises sold by
Schwartz personally, the following sums . . . total due plain-
tiff on above commissions under Subdivision A of the fourth
paragraph of said contract, $2,680.13.' "

### Evidence

The parties intended at the time of the execution of the
basic contract to include all of the transactions already per-
formed by plaintiff under the existing agreement.

The following is from the cross-examination of Mr. Schwartz
by Mr. Duque:

"Q. Yes, the contract was entered into on the 25th of
May, 1939, and you say you sold the franchise to Borden in
March of 1939? A. That is right, but it was understood with
Mr. Teunisz that I was to be paid that. It took me five months
to get him to sign a contract, he kept stalling me from day to
day until I caught him in New York, in my attorney's office
there, and I insisted that he sit down and dictate the terms of
that contract which covers me in everything which I have
sold up to that time and after that time.

"Q. By Mr. Duque : Then, as I understand your testimony, which you have just given, you sold the Borden account in 1939 ? A. That is right.

"Q. But you claim commissions of 25% on that sale because it was—— it is your contention that that sale was covered by this contract even though the contract had not been written then, is that correct ? A. That is right. It was understood that any contract made by Mr. Teunisz and myself, covered everything that I had written under it up to and after the date of the contract. . . .

"Q. Had you been negotiating the terms of this contract of May 25, 1939, for some little time ? A. For at least five months, yes, sir.

"Q. And during that time, had you been discussing this matter with Mr. Teunisz ? A. Yes, sir, day and night, sir.

"Q. And at the time that this contract was entered into, Mr. Teunisz had full knowledge of the contract to Borden ? A. Oh yes, yes, sir.

"Q. Was that discussed at the time that you signed this contract ? A. Oh, yes, sir, in Mr. Teunisz' office."

That this was the intention of the defendant also is brought out in the attitude of both Rhadans, defendant's accountant, and Irving H. Smith, *defendant's attorney*, when taking the deposition on August 31, 1945, that is defendant's Exhibit "D" by reference. The defendant Teunisz was present at the time and confirmed all of the statements made by Mr. Rhadans. The following is the testimony of Mr. Rhadans on examination by Mr. Smith :

"Q. And does that cover all commissions as contemplated by the original contract dated May 25, 1939, as long as it was in force ? A. Yes.

"Q. You say that you ceased paying the overriding or the five percent commission on September 1st, 1942, *which were paid on the original contract, the one sued on here.* Did Mr. Schwartz at any time after that make any complaint because he was not still receiving this class of commission ? A. No, sir." (Italics added.)

It is apparent that the parties considered the sales of franchises by Schwartz to be sufficient performance of the contract to entitle him to be paid commissions earned under the basic contract up to September 1, 1942. There is no dispute of any kind as to whether Schwartz was to receive payments ·for

franchise sales made under the contract—at least up to the time of trial.

The Civil Code provides in section 1636 that:

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."

The Civil Code provides in section 1642 that:

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

Here the parties entered into a contract of employment. Plaintiff, Schwartz, was to sell certain franchise rights for defendant Bottle Company and the Bottle Company was to pay him certain specified commissions. Schwartz then performed according to that agreement and did sell certain franchises and he was paid the specified commissions. It was not until he took his trip to the East, some five months later, that the contract was formally executed and signed by Mr. Schwartz and defendant Teunisz. Both parties were aware of the sales that had been made up to that time, and there was no language in the basic contract to exclude those sales but rather the general language used is to be considered as an intent to include those sales under the circumstances. (Civ. Code, § 1647.)

Later contracts between the parties expressly provided for the effect of prior dealings and whether or not they were to be included, as in the contract of July 23, 1940, where it states:

"This agreement will not effect [sic] business written by Schwartz in accordance to [sic] agreement dated April 26, 1940, between Teunisz and Schwartz."

Again in the contract of August 14, 1941, it is said:

"It is mutually agreed that business written by you under a prior agreement, if any, shall be honored in accordance with the terms of said agreement. . . ."

The fact that both parties acted under the basic contract as to payment of commissions on all the sales in issue here is conclusive as to their intent under the contract. The basic contract is the only source of obligation under which the defendants had to pay these commissions. For a period of over three years defendants paid plaintiff over $9,000, and neither side during that time questioned the obligation of defendants to pay. If there was any question as to the sufficiency of plain-

tiff's performance, defendants should have raised the issue before this.

The judgment is affirmed.

Moore, P. J., and Wilson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 10, 1947.